[No. A116520. First Dist., Div. Two. Oct. 18, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
TEMPLE LEE STUART, Defendant and Appellant.

**COUNSEL**

Law Office of Michael Satris and Michael Satris for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LAMBDEN, J.**—Defendant Temple Lee Stuart argues we should reverse the trial court's judgment and remand her case for further proceedings because the court abused its discretion in finding she did not overcome the statutory bar to probation consideration. She also makes a renewed request for release pending appeal. We affirm the judgment and deny defendant's request for release.

## BACKGROUND

Defendant was initially indicted for the murder of her mother Isabel Stuart. She pled guilty in September 2006 to the lesser included offense of voluntary manslaughter (Pen. Code, § 192, subd. (a)) and admitted an allegation that she was presumptively ineligible for probation (Pen. Code, § 1203, subd. (e)(3)), as charged in a complaint filed that same day. She also waived the sentencing rights afforded to her in *Blakely v. Washington* (2004) 542 U.S.

296 [159 L.Ed.2d 403, 124 S.Ct. 2531], and left sentencing to the court's discretion. The indictment was dismissed.

Defendant was an assistant harbormaster at a Sausalito yacht club, without a prior criminal record, and 59 years old at the time of sentencing. At the sentencing hearing, she acknowledged she placed a pillow over her elderly mother's head while Isabel[1] slept on the evening of January 11, 2004. The court sentenced her to the six-year midterm in state prison, and declined defendant's request for probation, finding defendant did not overcome the presumption against probation. In response to defendant's motion for reconsideration, the court modified the sentence to impose the lower three-year term in state prison, but declined to reconsider its ruling on probation. The court's determinations regarding probation are the primary issues of defendant's appeal.

*The Factual Basis for Defendant's Guilty Plea*

The factual basis for defendant's guilty plea was the prosecutor's written summary of the grand jury transcripts, which defendant's trial counsel stated was a fair recitation of the evidence. We now summarize its contents.

*The Death of Isabel Stuart*

In July 2003, Isabel, then 87 years of age, entered an assisted living facility (facility) in Novato, California. On January 11, 2004, a medical technician at the facility administered medication to Isabel as she did daily. Isabel was alert, conversant, voiced no physical complaints, and the technician noticed nothing unusual about Isabel's physical condition. Approximately 4:00 p.m. that day, another facility employee turned down Isabel's bed as she did daily, and helped Isabel get ready for bed in accordance with her typical practice.

When Isabel was found dead the next morning, her room appeared in order and there were no signs of trauma to her head or neck. There was evidence of lividity and rigor mortis in the body. Her death was treated as a natural one; the death certificate listed the cause as urosepsis, with diabetes type II as a contributing factor.

*Isabel Stuart's Medical Condition Prior to Her Death*

When Isabel was admitted into the facility, her level of required care was rated as a 3 out of 10, meaning she did not need much care at all, other than

---

[1] Throughout this opinion, we refer to members of the Stuart family by their first names after our initial identification of them in order to avoid unnecessary confusion. We mean no disrespect by doing so.

general assistance with bathing and showering. She received management for her medication, help with bathing, and household maintenance. Staff did not observe a change in her physical condition or behavior during her time there. She did not complain or exhibit any physical problems other than minor cold symptoms. She was able to get her own food and drinks independently, fed herself, and ate well. She never appeared depressed. The facility's executive director noted that Isabel was totally alert and oriented about her own need for medication. The staff also noted that she could be feisty or difficult to deal with on occasion, and that she clearly voiced concerns if she was suffering from any medical or physical complaints. All the staff who testified at the grand jury proceedings stated they were surprised to learn of her death.

William Stuart, Isabel's oldest son, and his son Carlos observed Isabel's body before its cremation, and both saw a large red oval, similar to a bruise, on the left side of her head, which Carlos described as about the size of a half dollar coin. Both were surprised to hear of Isabel's death, as they had spoken with her in the week prior to her death. She voiced no complaints about her physical condition and sounded upbeat and positive.

William also testified that in the summer of 2003 he was walking with defendant past the dining room area of the facility as they discussed defendant's business dealings with the elderly. Defendant at one point gestured to the elderly waiting for their dinner and said, "Look at these people. They're just waiting to die. Someone needs to put them down."

*Financial Transactions by Defendant*

Financial records indicated defendant received a $50,000 check from Isabel in November 2003 and paid nearly $43,000 over the next two weeks to various credit card companies. Her checking account balance was $1,214.59 as of December 29, 2003.

In December 2003, Isabel opened an investment account with a financial institution and deposited $500,000 into the account. Upon her death, defendant, as executor of the estate, disbursed over $499,000 of these funds through March 20, 2004; as of April 30, 2004, the value of the investment account was $0.06.[2]

*Testimony of Medical Experts*

Medical experts testified in the grand jury proceedings that there was no indication Isabel died of urosepsis. There was expert testimony that she

---

[2] The probation department's felony presentence report states defendant distributed the proceeds from Isabel's estate in a fair and equitable manner.

appeared to be stable and in her usual state of health just prior to her death; that physical findings of someone who died from smothering or asphyxia are subtle and can be almost nonexistent; that although Isabel had a significant medical history, all of her medical conditions appeared to be controlled at the time of her death; that there was no evidence that she had been clinically ill just prior to her death; and that the presence of a red oval mark over a person's left eyebrow or temple area could have some significance because, if lividity and rigor mortis have already occurred in the body and the mark remains on the front of the head, it would likely reflect an injury that occurred before death.

Isabel's primary care physician, who made the diagnosis that urosepsis was the cause of death, testified that this was a presumptive diagnosis on his part, made without examining Isabel at the time of her death or immediately beforehand, and that he should have questioned the diagnosis given the lack of symptoms. The last time he saw Isabel, on December 31, 2003, he believed her medical condition was manageable, and did not observe anything about her which required hospitalization or other treatment. Her death was unexpected.

*Defendant's Admissions to Craig and Nancy Stuart*

Craig Stuart, defendant's brother, testified before the grand jury that defendant called him twice on the evening of January 11, 2004. In the first call, defendant said that she was at their mother's apartment, that Isabel did not want to live anymore and had been in and out of the hospital for the last two weeks, and that she, defendant, was going to help Isabel die and was worried about being caught. AT&T records indicate the call was made at 7:06 p.m. Defendant called Craig later and stated she had suffocated Isabel with a pillow. Worried about leaving handprints, she had climbed on the bed and held the pillow over Isabel's face until she stopped breathing. Telephone records indicate this call occurred at 10:42 p.m. and lasted four minutes.

The next day, defendant met with Craig and his wife, Nancy. She told Nancy that she had killed Isabel after thinking about it for 30 hours. She decided that night to climb on her mother's bed and put a pillow over Isabel's face, placing her knees on each side of her mother's face because she did not want to leave marks or handprints on the pillow. She then proceeded to smother Isabel, who made a few bodily noises and then died. Defendant also later told Craig that she had climbed up on the bed and put her knees on either side of the pillow to keep her fingerprints off the pillow.

In April 2004, Craig told the Novato Police Department about defendant's involvement in her mother's death. The police monitored and recorded a telephone call between Craig and defendant, during which defendant acknowledged that she had killed Isabel, including her statement that she "took out Mom" on January 11. She also stated that Isabel could have lasted for years. During a discussion of finances, defendant told Craig she was upset that her other brother, William, wanted defendant to produce some financial records. She stated, "Four days after I kill my mother, he wants me to come up there with the fucking bank accounts? I couldn't eat, sleep, drink, walk! I couldn't do anything!" She also said, "Now it's like 10 days later, I couldn't get her cremated for 10 days, and for 10 days I didn't want to do anything cuz I was afraid she'd get exhumed and I was afraid I'd go to jail."

*Defense Evidence*

Among several witnesses provided by the defense during discovery who were interviewed by a police detective, Geoff Monk (whom defendant identified in subsequent papers as Isabel's longtime neighbor) and Edith Garrett, Isabel's sister, described Isabel as being in poor health. Geoff said Isabel would frequently state that life was not worth living, and on numerous occasions asked him to put a bag over her head and suffocate her. He believed that Isabel made such comments in jest, but noted that she was persistent and he would have to convince her that life was worth living. Edith described Isabel as a happy person until approximately the last two years of her life. She became depressed as her incontinence problem became worse, and told Edith on a regular basis that she did not feel life was worth living.

*Defendant's Contentions in Her Sentencing Memorandum*

In her statement in mitigation of sentencing memorandum, defendant contended Isabel's health had been in decline for several years, and that Isabel repeatedly told relatives, friends, and neighbors that "she did not want to live." Isabel had a myriad of physical ailments, including diabetes and related neuropathy, coronary artery disease, breast cancer, hypertension, incontinency, and a serious bladder infection that was diagnosed the week before her death. Defendant further contended that Isabel "was intent on taking her own life" on the evening of her death and did so "with Temple's assistance," as she "took a handful of pills, and lay down on the bed, having begged Temple to make sure she 'did not wake up.' "

Among other things, defendant attached three declarations to her sentencing memorandum. Geoff stated in a declaration that Isabel often expressed sincere and loving affection for defendant, and had more limited contact with

her other children. Isabel's physical health had deteriorated; she was particularly concerned about her inability to control her bladder and bowels, and this and other illnesses led her to repeatedly expressing her desire to take her own life. She researched ways to take her own life and discussed with him putting a plastic bag over her head on multiple occasions; although she asked him to do so apparently in jest, she also left no doubt that one day she would ask otherwise. She had a drawer filled with pills of all kinds, and twice overdosed, although he was not sure if she overdosed on purpose or accidentally. A couple of weeks before her death, he visited her, and found her sick and despondent. She was in "the worst physical health, and suffering more than I had ever seen," including from a bad skin condition with inflamed, oozing sores on her body. He had no doubt that the strong-willed Isabel had coerced Temple into her actions.

Edith stated in a declaration that Isabel had difficult and distant relations with her sons, relied increasingly on defendant to assist her in her daily life, and frequently expressed great love and affection for defendant. During the last several years of her life Isabel regularly talked about committing suicide, and was depressed and miserable in large part because she had become incontinent. As her health declined and she was forced into the nursing home, she talked more and more about suicide. She said in December 2003 that she was going to take pills she had stored up and end it all. Edith also had no doubt that Isabel participated in her own death.

The financial planner for Isabel's trust stated in a declaration that Isabel had indicated repeatedly that she did not want to live, and seemed very sick four days before her death during a telephone call.

Defendant also contended, based on a written report by Dr. Jess Ghannam, a clinical psychologist, that she suffered from chronic posttraumatic stress disorder (PTSD) as the result of the abusive relationship she had with her father and her brother Craig, and also suffered from chronic depression and anxiety. Dr. Ghannam opined that, on the night of the killing, defendant had "what could easily be described as a traumatic stress experience and completely disassociated from that experience and was not consciously aware of what she was doing."

Defendant further contended that Craig reported her to the police in order to obtain an advantage in a dispute over their father's estate after their father and their father's wife had killed themselves in April 2004, a few months after Isabel's death. Defendant also submitted letters from a number of people which indicated she was a respected member of her community.

*The Probation Department Presentence Report and Attached Statements*

The probation department presentence report summarized its view in a presentence report to the trial court as follows:

"The defendant appeared to be stressed by the responsibility of caring for an aging parent who was depressed and had many chronic medical conditions. Her mother may have made statements that she wanted to die and that she wanted the defendant's help with the process. Without objective evidence that the victim was in an extreme health crisis, using these statements as justification for killing her is unwarranted. The defendant seems genuine in her subjective belief that she was doing what her mother wanted to have done. However, there is no existing medical or physical evidence to support this perception. The defendant lied to her brother Craig about [Isabel's] health when she told him she had been in and out of the hospital in the days prior to the offense. There is nothing besides the defendant's statement that her mother had taken an overdose on the night of her death. Although she had expressed dissatisfaction with her life and a wish to commit suicide there is conflicting information on this issue. . . . There is no note that expresses this wish. Finally, planning was present because she called her brother to tell him that it was going to happen and told her sister in law that she had been thinking about it for 30 hours prior to the act. These last two factors also diminish the credibility that she was in a dissociative state when she committed the crime. . . . [¶] The family seems to believe that the defendant was motivated by a desire to inherit money from their mother's estate. The defendant did appear to have financial needs at the time of the crime that may have supported her decision. However, it does not appear to have been the primary motive."

The department recommended that probation be denied and defendant be given a midterm sentence of six years, noting that defendant was ineligible for probation unless the court found this to be an unusual case where the interest of justice supported a grant of probation. The department concluded that "this case does not seem unusual. The defendant intentionally took her mother's life and although it may have been mitigated by the stress and perception that she was doing what was in the best interest of her mother this is not reasonable justification for a local disposition."

The department attached to its report a number of letters and written statements, including statements by defendant, Craig, William, and the declarations of Edith and Geoff summarized above. A handwritten statement attached to the probation department's presentence report, apparently written

by defendant,[3] states: "My 87 year old mom injested [*sic*] an overdose of pills. After she passed away, I placed a pillow over her face, as requested & begged, for her not to fail in her attempt[.]"

Craig contended in his statement to the trial court that defendant was in need of money. He claimed defendant was living beyond her means prior to Isabel's death, and needed money to repair her boat, which was her home, around the time of Isabel's death. He concluded: "I believe [defendant] was between a rock and the good old hard spot and when mom finally got all her investments in order and she used her illness to carry out her plan to fake mom's suicide and get her hands on the money ASAP. . . . [A]ll she did as executor was to divide up the money in mom's account and to hell with all the rest of it. She destroyed all records, never came up with an accounting of moms assets and so on."

William submitted multiple statements. He contended defendant made questionable disbursements from Isabel's bank account, pressured her mother to sell her home too quickly for below market value, and received $50,000 for her help, and had financial problems with the repair of her boat. William also stated that he talked to his mother regularly about her health and finances, and that Isabel's "mind was in the long term mode of living well and surviving a long time." William indicated that as he learned more about his mother's death and financial matters, he "became convinced that Temple killed mother for money, and it was not a mercy killing."

*Defendant's Statement at the Sentencing Hearing*

At her sentencing hearing, a number of people addressed the court, including Craig, William, Edith and Geoff, who made statements similar to the contents of their previous submissions, as well as defendant. Defendant said she had talked her mother out of taking her life before, had had Isabel hospitalized after she stopped taking her medication, and put her in the facility because she realized Isabel could not stay alone anymore. She described the night of the killing as follows:

"And on the night in question, . . . she called me to come up and I went up, and she was really, really in bad shape. I mean, she was just—I didn't know my mom, she looked like walking death or sitting death. [¶] . . . [¶]

"So . . . when I walk in there that night . . . we talked about me, and she made sure that I had a great job . . . and I had a good life going, and she said

---

[3] The presentence report indicates a statement of defendant's is attached to the report.

she just had to go. She said, 'I just—I have to go this time, I can't—I'm miserable.'

"And I tried to talk her out of it, 'Mom, you would leave such a hole in my life if you split, are you sure this is what you want?' And she just stared at me. She didn't say anything back. And she got up and got her walker, and she was always going to the bathroom every five minutes, and she came out with her pills, and she said—and we'd had a rum and Coke over the couple of hours that we talked, but she said . . . 'would you get me a Coke?' So I did.

"And it wasn't a handful of pills, it was a bunch of pills, and old people can take a lot—or lots of pills at one time, so she took her pills. She went back to the bathroom and came out, walked over to her bed, ripped her caftan that she wore off and she got in bed.

"And again, I asked her, I said, 'Are you sure, mom?' And she just stared at me. But she'd asked me—I said, 'I have to go, I can't stay, I'm going to go get some cigarettes, I got to'—I just couldn't sit there any more. And she just said, 'Please, for God's sakes, don't let me come back as a vegetable, please, Temple.'

"So I left, and that's when I called my brother to give him the chance to maybe call her. And then I went back, and she was asleep, she wasn't moving, and so I took her pulse. I just did what she asked me to do. And I took a pillow and I put it over her head and she never made a move.

"And it was awful—hard, and I did kind of—I don't know how long I held it there. And then I rolled her over onto her side, because she never slept on her stomach—I mean on her back, and I sat with her, and then I just left."

*The Court's Initial Sentencing Ruling*

The court initially denied probation and sentenced defendant to a six-year prison term at a November 2006 sentencing hearing. The court stated: "I do not believe this case is about whether or not the decedent was in an extreme health crisis. I don't think it's about whether she wanted to end her life. There is conflicting information about that. [¶] . . . [¶]

"I have little doubt that Isabel Stuart had some suicidal thoughts. I have little doubt that she was, at least on occasion, in considerable pain, to the point where she questioned whether her life was worth living.

"The other thing that this case isn't about is assisted suicide. Miss Stuart pled guilty to voluntary manslaughter, not to assisted suicide."

The court rejected defendant's argument that her PTSD amounted to a mental condition that would overcome the presumption against probation, based on the evidence that defendant had thought about killing her mother for 30 hours beforehand, and that she did not want to do anything for the 10 days between her mother's death and cremation for fear of going to jail.

The court also rejected the argument that defendant committed the crime under conditions of great provocation or duress so as to overcome the presumption against probation, finding that the stress she experienced caring for an elderly and infirm parent did not rise to such a level.

Finally, the court noted that its court rules stated that among the objectives for sentencing are punishing the defendant and deterring others from criminal conduct. The court continued, "Putting all that together, with your admission that you're presumptively ineligible for probation, I've concluded that the only way justice can be served in our community is if you are imprisoned for the very grave crime of voluntarily killing your mother."

## Defendant's Motion for Reconsideration

After the court denied probation and sentenced defendant to six years in prison, defendant filed a request for reconsideration of the sentence based on "new" facts.

Defendant submitted a letter by Dr. Paul Good, a clinical and forensic psychologist. He opined that defendant's judgment was compromised by her PTSD, brought on by a childhood of abuse, including physical and sexual abuse by her father, and a prior rape she had suffered in the early 1970's in Greece. Dr. Good also referred to her stress and anxiety in the months prior to Isabel's death, her drinking, her "borderline personality traits of rapidly fluctuating perceptions and thoughts, as well as sudden and impulsive behavior, [which] contributed to her willingness to act precipitously," and the "family culture supportive of euthanasia." Defendant also contended that she was raised in a home where "right to die" choices were supposed to be carried out, and that her father was a Kevorkian devotee, as evidenced by his suicide a few months after Isabel's death.

The court heard defendant's motion for reconsideration in January 2007. It noted again defendant's admission to the presumption of probation ineligibility and its prior ruling that she had not overcome it. The court then stated:

"I agree with your attorney, that you are not a danger to society, but that's only one of the criteria for a grant of probation. In sentencing, I'm supposed to consider things like punishment for your crime and deterrence to other people.

"We have a lot of elderly people here in Marin County. Your killing of your mother, which you admitted that you did, is perhaps the most extreme form that elder abuse can take. I think I owe it to all of the senior citizens in our community and their children and other caregivers who lovingly tend to them, to impose a severe sanction on you for killing your mother."

The court stated it would not reconsider its order denying probation, but that whether defendant's sentence should be the mitigated term or the midterm was a very close call and, having revisited the factors in aggravation and in mitigation and noting that defendant did not have a prior criminal record, it would reduce her sentence to the mitigated term of three years.

*Defendant's Applications for Release on Bail Pending Appeal*

Defendant filed a notice of appeal, and applied to the trial court for continuation of her bail status pending appeal pursuant to Penal Code section 1272.1. The court denied this request at a February 2007 hearing. Defendant also filed an application to this court for release pending her appeal, which we denied by order dated March 29, 2007.

## DISCUSSION

Defendant argues the trial court abused its discretion in failing to find hers to be an "unusual case" within the meaning of California Rules of Court, rule 4.413 (rule 4.413).[4] This is not the case.

### I. *Legal Standards*

As we have already discussed, defendant admitted to the allegation that she was presumptively ineligible for probation pursuant to Penal Code section 1203, subdivision (e)(3), which provides that, "(e) Except in unusual cases where the interests of justice would be best served if the person is granted probation, probation shall not be granted to . . . [¶] . . . [¶] (3) [a]ny person who willfully inflicted great bodily injury or torture in the perpetration of the crime of which he or she has been convicted." In such a circumstance, a court determines whether the presumption against probation has been overcome pursuant to rule 4.413, which lists certain criteria relevant to this discussion as follows:

"(c) Facts showing unusual case

---

[4] Rule 4.413 was amended effective January 1, 2007. Although the lettering was changed, there were no substantive changes in the provisions we cite herein. Defendant was first sentenced in November 2006, but her motion for reconsideration was heard after January 1, 2007.

"The following facts may indicate the existence of an unusual case in which probation may be granted if otherwise appropriate: [¶] . . . [¶]

"(2) *Facts limiting defendant's culpability*

"A fact or circumstance not amounting to a defense, but reducing the defendant's culpability for the offense, including:

"(A) The defendant participated in the crime under circumstances of great provocation, coercion, or duress not amounting to a defense, and the defendant has no recent record of committing crimes of violence;

"(B) The crime was committed because of a mental condition not amounting to a defense, and there is a high likelihood that the defendant would respond favorably to mental health care and treatment that would be required as a condition of probation; and

"(C) The defendant is youthful or aged, and has no significant record of prior criminal offenses."

█ If a court determines the presumption against probation is overcome, it evaluates whether or not to grant probation pursuant to California Rules of Court, rule 4.414. However, "mere suitability for probation does not overcome the presumptive bar . . . . [I]f the statutory limitations on probation are to have any substantial scope and effect, 'unusual cases' and 'interests of justice' must be narrowly construed," and rule 4.413 "limited to those matters in which the crime is either atypical or the offender's moral blameworthiness is reduced." (*People v. Superior Court (Dorsey)* (1996) 50 Cal.App.4th 1216, 1229 [58 Cal.Rptr.2d 165].)

█ Under rule 4.413, the existence of any of the listed facts does not necessarily establish an unusual case; rather, those facts merely "*may* indicate the existence of an unusual case." (Rule 4.413(c), italics added.) This language indicates the provision "is permissive, not mandatory." (*People v. Serrato* (1988) 201 Cal.App.3d 761, 763 [247 Cal.Rptr. 322] [referring to identical language in Cal. Rules of Court, former rule 416(e)].) "[T]he trial court may but is not required to find the case unusual if the relevant criterion is met under each of the subdivisions." (*People v. Cattaneo* (1990) 217 Cal.App.3d 1577, 1587 [266 Cal.Rptr. 710] [also discussing Cal. Rules of Court, former rule 416].)

"The standard for reviewing a trial court's finding that a case may or may not be unusual is abuse of discretion." (*People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 831 [7 Cal.Rptr.2d 177].) The trial judge's discretion in

determining whether to grant probation is broad. (See *People v. Warner* (1978) 20 Cal.3d 678, 683 [143 Cal.Rptr. 885, 574 P.2d 1237].) "[A] ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 377 [14 Cal.Rptr.3d 880, 92 P.3d 369].) "[T]hese precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Ibid.*) Generally, " ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*Id.* at pp. 376–377.)

## II.  *The Court Acted Within Its Discretion*

### A.  *Conflicting Information in the Record*

Defendant argues the trial court ruled in an arbitrary and capricious manner, refusing to recognize the obviously unusual nature of her case in a number of respects. We disagree.

Defendant's arguments, discussed further, *post*, generally require one to accept defendant's version of her motivations and the relevant events to the exclusion of conflicting contentions. The trial court did not. Its statements at the sentencing hearing, including its reference to "conflicting information" about whether Isabel "wanted to end her life," indicate the court had doubts about defendant's contentions that Isabel played a role in her death in the early evening of January 11, 2004, and found at least equally credible the information provided by those who believed defendant killed her mother without Isabel's knowledge or consent. The court was entitled to do so. " ' ["]The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 [27 Cal.Rptr.2d 595, 867 P.2d 706].) We see no reason to conclude that the trial court was required to disregard these conflicting contentions under an abuse of discretion standard of review. Therefore, we reject defendant's arguments in her appellate papers that the trial court did not give any credit to these contentions, that these were "biased and reckless accusations" that "bore little relevance to the question whether appellant's case was an unusual one that fit the statutory exception to bar to probation

consideration," and that the trial court's "lack of formal rejection of them was an exercise of . . . exemplary judicial discretion."

The trial court had a reasonable basis for its sentencing ruling because of the "conflicting information." Aside from defendant's own contentions, there is no indication in the record that Isabel wanted to, or acted to, die on January 11, 2004. The record includes indications she was not in an acute health crisis. Family members and facility's staff provided information indicating that she was generally in good spirits (although others, such as Edith, indicated she was not). Facility staff reported nothing unusual about her behavior, or physical or mental condition, on the day of her death. No one other than defendant contended Isabel said anything about an intention to die that day, and she did not leave behind any statement reflecting such a decision.

Defendant contended to the trial court that she merely "assisted" Isabel to take her own life after her mother consumed an overdose of pills in her presence and urged defendant to ensure her death.[5] However, her statements in support of this contention were not particularly persuasive. At the sentencing hearing, defendant was somewhat vague about her mother's consumption of pills, stating Isabel took "a bunch of pills, and old people can take a lot—or lots of pills at one time, so she took her pills." Defendant's statement to the probation department was even less certain on the issue: "[Defendant] said her mother had been hoarding medication and intended to use it to kill herself that night. The victim asked for the defendant's help and expressed a fear that the attempt would be unsuccessful and that this result would be worse. . . . [Defendant] said that she went outside for a walk and when she returned she found her mother in bed. *She believed that the victim had taken the overdose of medication.* She decided to climb onto the bed and cover her head with the pillow to make sure that a death would be the result." (Italics added.)

Furthermore, according to the prosecution's summary of the grand jury transcripts, Craig and his wife Nancy indicated what they were told by defendant the night of the killing and in the days afterward. They did not refer to any statement about an overdose of pills, casting additional doubt on defendant's account.

---

[5] Defendant does not argue on appeal that she in effect participated in an "assisted suicide," instead arguing that "the homicide was the misguided act of mercy of a devoted daughter attending to her mother's suffering and expressed wish to die." While we consider this characterization herein, we also consider the statements and arguments she made to the trial court.

Defendant's credibility could be further questioned because the record contains conflicting statements by her about Isabel's condition when defendant returned to Isabel's apartment later that evening. The handwritten statement attached to the probation department's presentence report, apparently written by defendant, states: "My 87 year old mom injested [*sic*] an overdose of pills. *After she passed away,* I placed a pillow over her face, as requested & begged, for her not to fail in her attempt[.]" (Italics added.) This statement suggests defendant did nothing more than place a pillow over the dead body of her mother. However, defendant acknowledged in the recorded telephone call with Craig that she killed her mother, Craig recalled defendant told him she held a pillow over their mother until she stopped breathing, and Nancy recalled defendant told her Isabel made a few bodily noises before she died.

There was also an indication in the record that defendant may have misled Craig about her mother's condition prior to her death in order to justify her act. Craig remembered defendant telling him on the night of the killing that Isabel recently had been in and out of the hospital, but other evidence indicates Isabel was not.

Furthermore, the record includes indications that defendant, rather than acting in response to her mother's overdose of pills and urging on the night of January 11, 2004, may have begun thinking about killing her mother the day before, and that she did so with some deliberateness. Nancy recounted that defendant told her the day after the killing that she had thought about killing her mother for 30 hours before doing so. Defendant acknowledged killing her mother as she slept, which a reasonable person could believe was intended to reduce Isabel's ability to resist her attack. Craig and Nancy recalled defendant stating that she held a pillow over Isabel's face with her knees to avoid leaving fingerprints, suggesting defendant gave some thought beforehand to her attack.

The financial records information referred to in the prosecutor's summary, as well as contentions by Craig and William, indicate defendant may have had a financial motivation for killing her mother. Among other things, the information indicates she was in a weak financial condition and in need of funds when she killed her mother, and that after her mother's death she quickly distributed the $500,000 Isabel recently had set aside for her own care.

To summarize, despite entering a plea of guilty to voluntary manslaughter, defendant contended in effect that she had participated in an "assisted suicide." Putting aside that assisting a suicide is a felony pursuant to Penal Code section 401, a reasonable person could question defendant's account and her characterization of her crime. The trial court found this was not a

case involving an extreme health crisis, an assisted suicide, or about Isabel wanting to end her life, and that there was "conflicting information" about whether Isabel "wanted to end her life." These statements indicate the court gave at least some credence to the contentions which conflicted with defendant's account. The court did not abuse its discretion in doing so. A reasonable person could conclude from the record that defendant, whether or not she believed Isabel wanted to die, smothered her mother to death as Isabel slept on the evening of January 11, 2004, without Isabel's knowledge or consent, doing so after a day of thinking about it and at least in part for her own financial gain.[6]

## B. *Defendant's "Unusual Case" Argument*

Defendant argues that she plainly overcame the presumption against probation because "this was extremely unusual in the most basic, fundamental way central to the statutory bar: Ms. Stuart inflicted great bodily injury or death upon her mother out of a felt love for and duty to her. However misdirected those laudable impulses were, she acted 'from a heartfelt place,' which can rarely if ever be said about the willful infliction of death or great bodily injury." Defendant also asserts that "[t]he homicide of one's beloved parent prompted by care and concern for that aged parent and filial obedience to and honor of that parent's apparent wishes is a most peculiar manslaughter indeed, and one that is at the lowest end of the spectrum of moral opprobrium when examining the motives of those who willfully inflict great bodily injury or death." We disagree.

As we have already discussed, a reasonable person could conclude that defendant acted at least in part out of financial considerations, an all too common motivation for killing someone, and without Isabel's knowledge or consent. This undermines defendant's argument that she acted with a reduced moral culpability.

Furthermore, a killer's subjective belief about the reason for a crime, including that he or she acted out of the "compassion and empathy" that

---

[6] Even if Isabel had in some fashion consented to defendant's acts, we are satisfied from our independent research that defendant's actions should not be treated in effect as assisting a suicide. Our Supreme Court rejected an "assisted suicide" argument in *People v. Matlock* (1959) 51 Cal.2d 682 [336 P.2d 505] (*Matlock*), stating " 'where a person actually performs, or actively assists in performing, the overt act resulting in death, such as shooting or stabbing the victim, administering the poison, or holding one under water until death takes place by drowning, his act constitutes murder, and it is wholly immaterial whether this act is committed pursuant to an agreement with the victim . . . .' " (*Id.* at p. 694, followed in *People v. Cleaves* (1991) 229 Cal.App.3d 367, 376–377 [280 Cal.Rptr. 146]; but see *In re Joseph G.* (1983) 34 Cal.3d 429 [194 Cal.Rptr. 163, 667 P.2d 1176] [making an exception to *Matlock*'s murder rule when one of two people engaged in a simultaneous suicide effort actively employs the single instrumentality involved].)

defendant contends she acted upon here, does not necessarily mean the case is "unusual." It is not particularly unusual for a killer to believe his or her action was justified; it is, for example, the root of any vigilantism. Moreover, that defendant believes she acted out of good intentions has little, if any, bearing on an objective view of her legal and moral culpability under the circumstances. It is reasonable to conclude an adult child who takes it upon herself to commit the "mercy killing" of a very elderly parent based only on that parent's "apparent wishes" has abused a position of trust and committed a very serious crime. A court is not required to conclude such an act rests on a higher moral plane than any other killing. Indeed, to do so would potentially expose some of the most vulnerable in our society to the grave danger of being killed by "loved ones," however compassionate they may be, who are unable to resist a temptation that dovetails with their financial self-interest, as the record suggests may have been the case here. The trial court acted within its discretion in rejecting any arguments that defendant's motivations reduced her moral culpability, including because, as the trial court stated, defendant's killing of her mother was "perhaps the most extreme form that elder abuse can take."

## C. *Defendant's "Provocation and Duress" Argument*

Regarding rule 4.413(c)(2)(A), defendant argues the trial court erred by arbitrarily concluding defendant did not act out of great provocation and duress by "unaccountably discounting the great stress that built up in her over the long period of time she cared for her mother as her mother grew increasingly distressed at the deteriorating quality of her life." This argument also lacks merit.

The trial court stated at the sentencing hearing: "You were under the stress of caring for an elderly and infirm parent. I suspect that this is why the D.A.'s Office reduced this charge against you from first degree murder to voluntary manslaughter. But I can't find that this stress was so great as to mitigate this offense within the meaning of Penal Code Section 1203(e)(4)."

Defendant essentially argues that her circumstances, as a particularly close and loving child who cared for a strong-willed, deteriorating, elderly parent who wanted to die, created great stress upon her, amounting to great provocation and duress under rule 4.413. However, loving children attending to very elderly or chronically ill parents undoubtedly face analogous circumstances and stresses every day in virtually every community across our state. The record includes indications that defendant's stress, rather than being unusually great, may have been less than many experience in similar situa-

tions. Defendant's siblings and the facility's staff's recollections provided support for the view that Isabel was in good spirits generally, in stable physical condition, without an acute health crisis, and able to take care of many of her basic needs. Defendant's "great stress" argument is unpersuasive, to say the least.

Furthermore, defendant's argument is based on the questionable contention that Isabel "invited death as a savoir," implying that Isabel provoked or exerted duress upon defendant to act as she did on the evening of January 11, 2004. Other than defendant's own contentions, which reasonably could be questioned, there was again "conflicting information." On the one hand, Geoff, Edith, and Isabel's financial planner indicated that Isabel at times had referred to taking her own life, to life not being worth living, or to wanting to die. On the other hand, Isabel had recently established a trust account to care for herself and, according to William, her "mind was in the long term mode of living well and surviving a long time." Regardless, a reasonable person could believe that Isabel's comments to Geoff, Edith, and her adviser were not always serious (Geoff indicated he thought her talk of putting a bag over her head was in jest at the time) or were depressed ponderings rather than concrete plans of suicide. Most importantly, no one other than defendant asserted any knowledge that Isabel intended to kill herself on January 11, 2004. A person's stated desire to die or to kill oneself—or even that person's attempt at suicide[7]—does not establish that the person thereafter sought to die at a particular place and time.

▇ Even if Isabel had urged defendant to help her die, we fail to see how Isabel's persistent "begging," as defendant characterized it in the recorded phone call with her brother Craig,[8] or her actions on the evening of January 11, 2004 (as related by defendant), amounted to the great provocation or duress referred to in rule 4.413(c)(2)(A). "Provocation" typically involves circumstances in which a person is provoked to act in the heat of passion (see, e.g., *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704 [54 Cal.Rptr.2d 608] ["provocation may be anything which arouses great fear, anger or jealousy"]). As we have already discussed, a person could reasonably conclude from the record that defendant thought about her actions for more than a day before killing Isabel, killed her only after leaving and then returning while Isabel slept, and committed the act with a deliberate care so as to avoid leaving fingerprints behind. Under these circumstances, it was

---

[7] Geoff stated Isabel had overdosed on medication in the past, but he did not know if she had done so accidentally or on purpose.

[8] Defendant stated to Craig in this phone call about killing her mother, "My Mom begged me. Begged me. Begged me."

reasonable for the trial court to conclude defendant did not act out of "great provocation."

■ "Duress" (and "coercion," also referred to in rule 4.413(c)(2)(A)) typically involves the use of threats or menaces to induce a person to act. (See, e.g., CALJIC No. 4.40 [regarding the defense of duress], discussed in *People v. Hinton* (2006) 37 Cal.4th 839, 882–883 [38 Cal.Rptr.3d 149, 126 P.3d 981] and *People v. Wilson* (2005) 36 Cal.4th 309, 331 [30 Cal.Rptr.3d 513, 114 P.3d 758]; *People v. Heath* (1989) 207 Cal.App.3d 892, 900 [255 Cal.Rptr. 120] ["[a] defendant claiming the defense of duress or coercion may properly rely on CALJIC No. 4.40"].) The record does not contain indications of any threats or menaces asserted by Isabel. Thus, it was reasonable for the trial court to conclude that Isabel's urgings, to the extent they occurred, and the "stress" defendant experienced caring for her mother, did not constitute "great duress."

Defendant also contends as part of her "provocation and duress" argument that she was raised in a family in which "the family ethic of taking responsibility for end-of-life decisions added to her compulsion to take such drastic action." This too necessarily relies on defendant's own contention that she merely assisted Isabel's effort on January 11, 2004, to take her own life, which can be reasonably questioned. Regardless, it is certainly reasonable to conclude that a "family ethic," however much internalized by defendant, does not rise to the level of great provocation or duress either.

In short, the trial court acted within its discretion when it found defendant failed to establish she acted based on great provocation or duress sufficient to overcome the presumption against probation.

D. *Defendant's "Mental Condition" Argument*

Regarding rule 4.413(c)(2)(B), defendant argues the trial court erred by arbitrarily rejecting "the evidence that Ms. Stuart's mental disorders and life experience made her particularly vulnerable to that stress and impaired her judgment to the point that she concluded that she was acting pursuant to her mother's wish and in her best interest." Again, we disagree. The trial court stated at the sentencing hearing:

"Your psychologist says that you suffer from Posttraumatic Stress Disorder, that you committed the crime possibly while in a dissociative state, and that you have a paranoid personality disorder.

"However, you admitted that you'd been thinking about your mother for 30 hours before you did it, and you told your brother, in that pretext call, that for 10 days after your mother's death until she was cremated, you didn't want to do anything because you were afraid that you might be found out and go to jail.

"I can't find that you committed this crime as a result of any mental condition that would overcome the presumptive ineligibility for probation."

Defendant's "mental condition" argument is somewhat strained. She contends certain mental conditions, which she states are "primarily" PTSD from an abusive childhood, anxiety and personality disorders, "contributed to [defendant's] compromised judgment in coping with the trauma of her mother's suffering" and "caused her . . . to conclude that her mother wanted her to kill her and to kill in accordance with that conclusion." On its face, this is a very attenuated argument that she killed Isabel "because of" a mental condition. (Rule 4.413(c)(2)(B).) Moreover, the trial court reasonably could be skeptical about the diagnoses of Drs. Ghannam and Good because they were based largely on defendant's own statements about her history and the events and motivations that led to Isabel's death; it was reasonable to question defendant's credibility. The trial court reasonably could reject defendant's "mental condition" arguments for these reasons alone.

Defendant argues the trial court's reference to defendant's 30 hours of prior thinking was not sufficient to reject all of her mental condition arguments, since it detracts only from the diagnosis that she killed her mother in a dissociated state. To the contrary, the court's reference suggests a rejection of defendant's "mental condition" argument altogether based on the "conflicting information," which included indications that defendant, rather than reacting to Isabel's urgings the evening of January 11, 2004, killed her mother without her knowledge or consent at least in part for financial gain. In any event, Dr. Ghannam emphasized dissociation when discussing defendant's actions the night of the killing, and stated that defendant's dissociative reaction "is a classic symptomatic expression of traumatic stress syndrome." In other words, he drew a direct relationship between this dissociation and defendant's PTSD, making the court's emphasis of her advanced planning relevant to her PTSD contentions as well.

Defendant also challenges the trial court's reference to her understanding that she had engaged in criminal conduct as evidenced by her actions in the 10 days after Isabel's death, arguing there is no logical connection between defendant's understanding that her conduct was criminal and "the statutory

criterion that her mental disorder contributed to her offense." Putting aside that the criterion is in any event permissive in nature (*People v. Serrato, supra,* 201 Cal.App.3d at p. 763),[9] the court could reasonably conclude otherwise, given Dr. Ghannam's own opinion that "the patient had what could easily be described as a traumatic stress experience and completely dissociated from that experience *and was not consciously aware of what she was doing.*" (Italics added.)

Drs. Ghannam and Good also did not provide a great deal of support for the contention that defendant killed her mother because of anxiety or a personality disorder. While Dr. Ghannam indicated that defendant "has many features consistent with someone who is struggling with a lot of paranoid ideas," he specifically stated that "[a]t this time we have to *rule out* the possibility of a personality disorder." (Italics added.) He indicated defendant has a great deal of anxiety, but did not indicate it caused her to kill her mother. Dr. Good referred to PTSD, dissociation, and "borderline personality traits," but also stated that "[t]hese situational and personal factors would not have led to the death of Isabel Stuart but for the family culture supportive of euthanasia." This family culture is hardly a mental condition. Thus, even if believed, the diagnoses relied on by defendant were not so persuasive as to establish conclusively that defendant killed Isabel because of a mental condition.

In short, the trial court did not abuse its discretion when it found defendant's mental condition contentions were not sufficient to overcome the presumption against probation.

### E. Defendant's "General Deterrence" Argument

Finally, defendant argues the trial court erred by relying too heavily on "general deterrence" in determining her sentence. Defendant acknowledges that general deterrence is a valid sentencing objective pursuant to California Rules of Court, rule 4.410. However, she contends the trial court gave inappropriate emphasis to it, as evidenced by the court's statement that "I owe it to all of the senior citizens in our community, and to their children and other caregivers who lovingly tend to them, to impose a severe sanction on you for killing your mother." We reject this argument as well. The record indicates the trial court carefully and sufficiently considered the specific circumstances of this case. It acted within its discretion when it made this statement as a part of its determinations.

---

[9] Defendant implicitly acknowledges the permissive nature of these criteria by not insisting the trial court was required to find defendant's case was unusual because of her age and lack of a criminal record, despite the criteria stated in rule 4.413(c)(2)(C).

## DISPOSITION

The judgment is affirmed. Accordingly, defendant's request that this court "further order [defendant] released pending its review of the trial court's ultimate determination" is denied.

Haerle, Acting P. J., and Richman, J., concurred.