Filed 10/13/21  P. v. Perlman CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ROBERT PERLMAN,<br><br>　　　Defendant and Appellant. | A157409<br><br>(Marin County Super. Ct. No. SC195601A) |

Robert Perlman pressed the muzzle of what appeared to be a semiautomatic handgun into a pharmacy employee's cheek as he stole more than $12,000 worth of prescription drugs.  In 2019, a jury convicted Perlman of second degree robbery (Pen. Code, § 211)[1] and commercial burglary (§§ 459, 460, subd. (b)) and found true an allegation that Perlman personally used a deadly and dangerous weapon during the commission of the robbery (§ 12022, subd. (b)(1), deadly weapon enhancement).[2]  The trial court found Perlman

---

[1] Undesignated statutory references are to the Penal Code.

[2] The jury found the allegations that Perlman personally used a firearm "within the meaning of" sections 12022.5 and 12022.53 were not true.

1

ineligible for probation and sentenced him to six years in state prison, comprised of the aggravated five-year term for the robbery and an additional year for the deadly weapon enhancement.

Perlman appeals. He contends the court erred by excluding impeachment evidence and by declining to instruct the jury with CALCRIM No. 306 regarding untimely disclosure of evidence. Perlman also raises claims of sentencing error: he argues the court abused its discretion by denying probation, sentencing him to the aggravated term, and declining to strike the deadly weapon enhancement.

We modify the judgment to impose a midterm sentence of two years on the commercial burglary conviction and to stay execution of that sentence pursuant to section 654. As modified, we affirm.

## BACKGROUND

The prosecution charged Perlman with second degree robbery (§ 211) and commercial burglary (§§ 459, 460, subd. (b)) and alleged Perlman used a firearm in the commission of the robbery (§§ 12022, 12022.5, 12022.53). Perlman's first trial ended in a mistrial after the jury was unable to reach a verdict.

### A.

In 2015, Jose M., M.M., and Bryce L. worked at a pharmacy in a Corte Madera shopping center. The pharmacy stored controlled substances—

---

Although the verdict form for the allegation under section 12022, subdivision (b)(1) expressly referred to the deadly weapon as a "firearm," defense counsel referred to the weapon as a BB gun or a "replica" firearm. We therefore refer to the weapon used in the robbery as a weapon. Perlman does not challenge the sufficiency of the evidence supporting the deadly weapon enhancement. (*Upshaw v. Superior Court* (2018) 22 Cal.App.5th 489, 504, fn. 7 [appellate court need not consider issues unsupported by cognizable legal argument or citation to authority].)

2

including Oxycodone and Percocet—in a locked cabinet. Only Bryce, the pharmacist, had a key to the cabinet.

At 1:00 p.m. on an April 2015 afternoon, a man carrying what appeared to be a black semiautomatic handgun leaped over the pharmacy counter. He was wearing white overalls, a mask, sunglasses, and a hat. The man approached Jose, pointing the weapon at him. Afraid, Jose raised his hands in the air. The man pressed the muzzle of the weapon into Jose's cheek. He demanded Oxycodone and Percocet. Then he ordered Jose to put the drugs in a bag. Jose retrieved a plastic shopping bag from underneath a cash register and brought it to the controlled substances cabinet.

M.M. saw what was happening and tried to escape. The man stopped her. He pointed the weapon at M.M., approached her, and said " 'bitch, where do you think you are going.' " He told M.M. to " 'get [her] ass over' " to the back of the store, near the controlled substances cabinet. She complied. Bryce was next to the cabinet. He was "panicked" because he saw the man jump the counter, point the weapon at Jose, and demand the painkillers. Bryce unlocked the cabinet and put the prescription drugs—26 bottles of pills worth $12,400—into the plastic bag. Jose gave the bag to "the robber."

The man ordered the employees to lie on the floor; then he left the pharmacy holding the white bag. Pharmacy surveillance cameras recorded the robbery. After the man left, Bryce called 911.

### B.

Minutes later, Central Marin Police Sergeant Jenna McVeigh arrived at the pharmacy. She checked with nearby businesses for video surveillance. She was looking for a person or a car leaving the area quickly, "like somebody would when they are trying to get away from the scene." The next day,

McVeigh watched surveillance video from a gas station adjacent to the shopping center. It showed a BMW enter the gas station parking lot at 12:55 p.m. on the day of the robbery. Just before 1:00 p.m., a man wearing white overalls walked through the shopping center.

A few minutes later, a man "matching the description of the suspect from the robbery" walked quickly along a row of bushes separating the shopping center from the gas station. He was carrying a "white bundle" but no longer wearing white overalls. The man paused at the bushes, then continued toward the BMW. Upon reaching the BMW, the man placed the bundle in the trunk and got into the passenger seat. Then the car sped away, cutting across several lanes of traffic and nearly colliding with another vehicle.

In the bushes separating the shopping center from the gas station, McVeigh found "a set of clear vinyl gloves." The gloves appeared to have been "shoved" in the bushes recently. McVeigh photographed the gloves and booked them into evidence. Perlman's DNA was found on the gloves.[3]

## C.

Law enforcement officers discovered that Kurt Allsman was driving the BMW on the day of the robbery. Perlman and Allsman were friends: Perlman regularly spent the night at Allsman's apartment. Both men used drugs. Two weeks before the robbery, Perlman predicted that Allsman was " 'going to feel betrayed' " by Perlman. Allsman thought Perlman's comment was "strange," but he did not ask Perlman to explain himself. Allsman had a distinctive limp.

---

[3] The parties described the gloves as rubber, latex, and/or thin plastic. The color of the gloves, according to the parties, was clear or off-white. Officers found a BB gun in a parking lot near the pharmacy. It did not resemble the weapon used by the robber.

On the day of the robbery, Allsman drove his BMW to the gas station near the shopping center. Perlman accompanied him. Just before they arrived at the gas station, Perlman said he needed to go to the shopping center. Perlman got out of the car; Allsman drove to the gas station. Several minutes later, Perlman returned to the BMW. He put something in the trunk and got into the passenger seat.

Perlman told Allsman he had " 'robbed a pharmacy' " and discarded the "overalls [and] gloves." Worried the police would apprehend them, Allsman quickly left the gas station and drove back to his apartment. Perlman brought the drugs inside; then the two men ingested Oxycodone. Later, Allsman hid the drugs.

Law enforcement officers searched Allsman's apartment. They found a large quantity of latex gloves, as well as items packaged together in a way that suggested a robbery was in the works, including a sheathed knife, electric tape, batting and motorcycle gloves, a wig, and a camouflage mask. At least one vinyl glove was also found in the apartment. Allsman told the officers where the drugs were hidden.

Allsman was arrested and pled guilty to robbery. Later, officers arrested Perlman.

## DISCUSSION

### I.

### Exclusion of Impeachment Evidence

Perlman contends the trial court erred by refusing to allow defense counsel to impeach McVeigh "with her prior use of a false identification."

### A.

### *Background*

In his opening statement, defense counsel conceded "there was a

5

robbery of a pharmacy" and that Allsman "was the getaway driver." Counsel also acknowledged Perlman's DNA was on the gloves found in the bushes. But counsel attempted to diminish the significance of the DNA evidence by noting an unidentified male contributor's DNA was also on the gloves and that anyone—including Allsman—could "have gotten ahold of [the] gloves."

On direct examination, McVeigh testified the gloves she found in the bushes were made of "clear vinyl." McVeigh explained that she was familiar with the difference between latex and vinyl gloves because she once worked in the paint department of a hardware store. According to McVeigh, latex gloves are "solid white." By contrast, vinyl gloves "are more transparent" and "tend to give off a little bit of a shine or sheen" when worn.

On cross-examination, defense counsel noted McVeigh had previously testified the gloves were latex or rubber. Counsel pointed out that McVeigh had changed her testimony and was now "saying [the gloves are] vinyl." In response, McVeigh acknowledged she "misspoke" the last time she testified. McVeigh explained that in her police report, she stated the gloves were "clear latex or clear gloves," but as she prepared to testify for a second time, she realized the gloves were "actually vinyl." McVeigh conceded the term "latex" was a "poor description" for the gloves. Defense counsel cross-examined McVeigh at length regarding her discovery of the gloves in the bushes, the difference between latex and vinyl gloves, and the change in her testimony.

After McVeigh finished testifying, defense counsel filed a supplemental motion in limine seeking to impeach McVeigh with a 2004 arrest or citation for "attempting to enter a bar with a California Driver's License in another woman's name" in violation of Vehicle Code section 14610, subdivision (a)(3). Counsel argued the misdemeanor conduct was relevant because McVeigh "changed her testimony on a critical point" and the link between Perlman's

DNA and the robbery was "entirely dependent on her credibility." But counsel made no offer of proof about the 2004 incident, other than to assert that McVeigh was cited or arrested for attempting to use false identification. The prosecutor opposed the motion.

The court declined to admit the evidence. It concluded the "arrest" was "too stale" and had "very little if any probative value." During closing argument, defense counsel emphasized the change in McVeigh's testimony regarding the gloves' material and urged the jury to consider the possibility that she "fudged the evidence" about the gloves in an attempt to "set [Perlman] up."

### B.

### *No Abuse of Discretion in Excluding the 2004 Incident*

Subject to Evidence Code section 352, prior misconduct involving moral turpitude is admissible to impeach a witness in a criminal trial. (*People v. Clark* (2011) 52 Cal.4th 856, 931.) Evidence Code section 352 allows a court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A trial court's exercise of discretion regarding whether to admit or exclude impeachment evidence will ordinarily be upheld on appeal. (*Clark*, at p. 932.) A "reasonable difference of opinion" does not establish an abuse of discretion. (*People v. Clair* (1992) 2 Cal.4th 629, 655.)

When determining whether to admit a prior conviction for impeachment, a relevant factor is whether the conviction "is near or remote in time." (*People v. Clark, supra,* 52 Cal.4th at p. 931.) "Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is

7

less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude. [Citation.] . . . '[C]ourts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' " (*Id.* at pp. 931–932.)

Perlman complains the court erred by precluding defense counsel from impeaching McVeigh with "her prior use of a false identification." This argument fails because defense counsel made no offer of proof regarding the 2004 incident. A defendant's failure to make an offer of proof or present any evidence of the underlying conduct, so that the reviewing court does "not know what the underlying conduct was, whether or how it would have been significant, how defendant would have attempted to prove it, or whether he could have done so," normally renders a claim that a trial court should have admitted evidence of the underlying conduct "noncognizable." (*People v. Chatman* (2006) 38 Cal.4th 344, 373.)

The argument also fails on the merits. We assume for the sake of argument that the unlawful use of a driver's license is a crime of moral turpitude. (See *People v. Bedolla* (2018) 28 Cal.App.5th 535, 549 [trial court admitted misdemeanor conviction for providing false identification to a peace officer in violation of section 148.9 "because it was a crime of moral turpitude"].) But we discern no abuse of discretion in the trial court's exclusion of the evidence under Evidence Code section 352. As the court observed—and as Perlman acknowledges—the incident was 15 years old. At a certain point, evidence that is too remote lacks probative value. (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 448, fn. 4.) The court was well within its discretion to conclude McVeigh's use of another person's driver's license more than a decade earlier had limited relevance. (*People v. Clair*, *supra*,

8

2 Cal.4th at p. 655; *People v. Mireles* (2018) 21 Cal.App.5th 237, 246–247 [no abuse of discretion in excluding remote misdemeanor convictions].)

The court's implied conclusion that the slight probative value of the 2004 incident was substantially outweighed by the danger of undue prejudice and confusion was also reasonable. (*People v. Clair, supra,* 2 Cal.4th at p. 655; *People v. Calhoun* (2019) 38 Cal.App.5th 275, 301 [no abuse of discretion in excluding evidence of victim's criminal conduct pursuant to Evidence Code section 352]; *People v. Feaster* (2002) 102 Cal.App.4th 1084, 1094 [impeachment with conviction that was 12 years old posed "significant danger of undue consumption of time and undue prejudice"].)

We conclude the trial court did not abuse its discretion by excluding the evidence. Having reached this conclusion, we reject Perlman's claim that the court's ruling violated his federal constitutional rights to present a defense, to confront and cross-examine witnesses, and to receive a fair trial. Excluding evidence with marginal impeachment value pursuant to Evidence Code section 352 does not impermissibly infringe on a defendant's federal constitutional rights. (*People v. Robinson* (2005) 37 Cal.4th 592, 626–627.) During defense counsel's vigorous cross-examination, McVeigh acknowledged changing her testimony and conceded mistakenly describing the gloves as latex. On this record, Perlman has not shown the admission of the 2004 incident " ' "would have produced 'a significantly different impression of [McVeigh's] credibility." ' ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 455.)

## II.

### CALCRIM No. 306

Perlman contends the court erred by declining to instruct the jury on untimely disclosure of evidence.

9

## A.

### *Background*

Defense counsel's supplemental motion in limine requested the court instruct the jury with CALCRIM No. 306.[4] Counsel suggested the prosecution knew McVeigh planned to testify that the gloves were vinyl—not latex—and failed to timely disclose that information. The prosecutor disagreed. She explained that she spoke to McVeigh the afternoon before McVeigh testified at Perlman's retrial. During that conversation, McVeigh divulged that she learned about gloves while working at a hardware store. Before this unprompted disclosure, the prosecutor had no knowledge of McVeigh's experience with gloves. That evening, the prosecutor disclosed the information to defense counsel. The prosecutor did not, however, disclose that McVeigh would testify that the gloves were vinyl because, as she explained, she did not know that McVeigh would so testify until she did so.

The court declined to give CALCRIM No. 306. It explained: "I'm not hearing anything that causes me to disbelieve the prosecution, or to believe that [the prosecutor] is lying, and as a result I'm not inclined to give the instruction . . . because the information I have is [the prosecutor] received the information" and "timely" disclosed it. The court also concluded McVeigh's change in testimony had not harmed the defense because vinyl and latex gloves were found in Allsman's apartment.

---

[4] CALCRIM No. 306 provides: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the (People/defense) failed to disclose: <describe evidence that was not disclosed> [within the legal time period]. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

10

## B.

### *No Abuse of Discretion in Declining to Give CALCRIM No. 306*

As relevant here, section 1054.1—the reciprocal discovery statute—requires the prosecution to disclose to the defendant certain categories of evidence " ' "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies." ' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 279–280.)  Evidence subject to disclosure includes "[r]elevant written or recorded statements of witnesses . . . whom the prosecutor intends to call at the trial."  (§ 1054.1, subd. (f).)  Section 1054.1, subdivision (f) also requires disclosure of "relevant oral statements of witnesses, other than the defendant, whom [the prosecutor] intend[s] to call at trial."  (*Roland v. Superior Court* (2004) 124 Cal.App.4th 154, 167; *People v. Hughes* (2020) 50 Cal.App.5th 257, 280.)  " 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial.' "  (*Verdugo*, at p. 280; § 1054.7.)

"Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute," including advising " 'the jury of any . . . untimely disclosure.' "  (*People v. Verdugo, supra*, 50 Cal.4th at p. 280; *People v. Riggs* (2008) 44 Cal.4th 248, 306–311 [approving use of instruction "congruent with" CALCRIM No. 306].)  We review a trial court's finding on whether a discovery violation occurred for substantial evidence (*Riggs*, at p. 306) and its ruling on whether to impose a sanction for abuse of discretion (*People v. Ayala* (2000) 23 Cal.4th 225, 299).

11

The trial court did not abuse its discretion by declining to instruct the jury with CALCRIM No. 306. The court found the explanation from the prosecutor regarding her knowledge of McVeigh's prior experience with gloves and identification of the gloves as vinyl to be credible. The court also determined that the prosecutor, upon learning the information, "timely" disclosed it to defense counsel. We will not disturb these conclusions, which are supported by substantial evidence and premised on the lower court's credibility determination. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.)

In any event, any assumed failure to give the untimely disclosure instruction was harmless under any standard of reversible error. (*Chapman v. California* (1967) 386 U.S. 18, 22; *People v. Watson* (1956) 46 Cal.2d 818, 836.) To be sure, the gloves containing Perlman's DNA bolstered the prosecution case. But McVeigh's testimony about the *material* of the gloves was not the lynchpin. Vinyl gloves—along with latex gloves and items comprising a robbery kit—were found at Allsman's apartment, where Perlman spent the night. Gloves containing Perlman's DNA were found in the bushes near the pharmacy. Whatever material was used to manufacture those gloves, other gloves made of that same material were found at Allsman's apartment, Perlman's DNA was on the gloves found in the bushes, and Allsman's testimony—corroborated by surveillance video—linked Perlman to the robbery. Thus, the fact that McVeigh did not identify any gloves as vinyl in the first trial—which resulted in a mistrial—does not support a finding of prejudicial error under any standard.

Additionally, defense counsel extensively cross-examined McVeigh about the change in her testimony. During closing argument, counsel suggested McVeigh changed her testimony and fabricated the evidence about the gloves. Defense counsel's closing argument—which urged the jury to

12

consider the timing of McVeigh's change in testimony—tracked the jury instruction. On this record, the court's failure to instruct the jury with CALCRIM No. 306 did not affect the verdict.

## III.

## Sentencing Claims

Perlman asserts the trial court abused its discretion by denying probation, sentencing him to the aggravated term on the robbery conviction, and declining to strike the deadly weapon enhancement. The parties agree the court erred by failing to impose sentence on the commercial burglary conviction before staying the sentence pursuant to section 654.

## A.

### *Background*

The jury convicted Perlman of second degree robbery (count 1) and commercial burglary (count 2), and found true the allegation that Perlman personally used a deadly weapon during the commission of count 1 (§ 12202, subd. (b)(1)). The probation department recommended the court impose a prison sentence on count 1 but suspend execution and place Perlman on probation.

The probation department noted Perlman placed a "gun barrel into" one victim's face—indicating viciousness—and that the crimes "exhibited planning and professionalism." But the department downplayed the seriousness of the offense, describing the weapon as a BB gun or a "replica" and noting that Perlman committed the crimes while "abusing prescription opiates." The probation department acknowledged Perlman had numerous misdemeanor convictions and "challenges" complying with previous grants of probation, and that he was on probation when he committed the offenses. Nonetheless, the department opined Perlman was a suitable candidate for

13

probation because he would "be negatively impacted by incarceration" and would "benefit from services offered in the community." Defense counsel joined the probation department's recommendation. In the alternative, counsel advocated for a mitigated prison term in light of mitigating factors including Perlman's drug addiction.

The prosecutor urged the court to sentence Perlman to a six-year prison term, comprised of the aggravated term on count 1 plus an additional year on the deadly weapon enhancement. She highlighted numerous aggravating factors, including the planning and sophistication of the crimes, the threat of bodily harm, and the use of a weapon. Additionally, in the prosecutor's view, Perlman's failure to address his substance abuse problem—and his criminal conduct to support that substance abuse problem—supported the aggravated term.

The court declined to find "unusual circumstances" warranting a grant of probation: it noted Perlman "had prior opportunities to address his drug and alcohol problems" and either "failed to take advantage" of those opportunities or was unsuccessful in overcoming his substance abuse. It found the case "was more serious as compared to other instances of the same crime" because Perlman robbed a pharmacy during the middle of the day with a weapon that "looked real" and the pharmacy employees were vulnerable because they were in an enclosed area "with no real ability to escape." Perlman, the court observed, had a significant prior record and a history of poor performance on probation. Finally, the court determined the offenses were "serious" and Perlman posed "a danger to others."

Next, the court determined the aggravated five-year term on count 1, the robbery conviction, was "the correct term." It reached this conclusion

14

after considering—and balancing—the aggravating and mitigating factors, including defense counsel's argument that the crime appeared "to be an act of desperation fueled by addiction" and "that the firearm was not in fact a firearm, but was a replica." The court declined to strike the deadly weapon enhancement. It stayed "any time" on count 2, the commercial burglary conviction, pursuant to section 654.

## B.

### *No Abuse of Discretion in Denying Probation*

A person "who used, or attempted to use, a deadly weapon upon a human being in connection with the perpetration of the crime of which he or she has been convicted" is not eligible for probation. (Former § 1203, subd. (e)(2).) This presumption may be overcome in "unusual cases where the interests of justice would best be served if the person is granted probation." (*Id.*, subd. (e).) California Rules of Court, rule 4.413 provides factors the court should apply to determine if the case is "unusual." (*Id.*, (b), (c).)[5] But "the existence of any of the listed facts does not necessarily establish an unusual case; rather, those facts merely '*may* indicate the existence of an unusual case.' " (*People v. Stuart* (2007) 156 Cal.App.4th 165, 178 (*Stuart*).)

---

[5] "Rule" references are to the California Rules of Court. Among the factors the court should consider to determine whether a case is unusual are: (1) the "circumstance giving rise to the limitation on probation is . . . substantially less serious than the circumstances typically present in other cases involving the same probation limitation, and the defendant has no recent record of committing similar crimes or crimes of violence;" (2) the "defendant participated in the crime under circumstances of great provocation, coercion, or duress not amounting to a defense, and the defendant has no recent record of committing crimes of violence;" and (3) the "crime was committed because of a mental condition not amounting to a defense, and there is a high likelihood that the defendant would respond favorably to mental health care and treatment that would be required as a condition of probation." (Rule 4.413(c)(1)(A), (c)(2)(A)–(B).)

15

" '[M]ere suitability for probation does not overcome the presumptive bar. . . . [I]f the statutory limitations on probation are to have any substantial scope and effect, "unusual cases" and "interests of justice" must be narrowly construed,' and rule 4.413 'limited to those matters in which the crime is either atypical or the offender's moral blameworthiness is reduced.' " (*Ibid*.)

" 'The standard for reviewing a trial court's finding that a case may or may not be unusual is abuse of discretion.' [Citation.] The trial judge's discretion in determining whether to grant probation is broad. [Citation.] '[A] " 'decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." ' " ' [Citation.] '[T]hese precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.' " (*Stuart*, *supra*, 156 Cal.App.4th at pp. 178–179.)

Perlman acknowledges he was presumptively ineligible for probation under section 1203, subdivision (e)(2) but claims his case was unusual and that the interests of justice support a grant of probation. The trial court was not persuaded, and neither are we. After carefully considering the probation report and the parties' sentencing memoranda, the court found Perlman's case "did not fall in the class of 'unusual cases where the interest of justice demands a departure from the declared policy.' " (*People v. Jones* (1962) 203 Cal.App.2d 228, 230.) Ample evidence supports that determination. Perlman pressed the muzzle of a weapon into a pharmacy employee's cheek during a brazen mid-afternoon robbery. He threatened another employee and "panicked" the pharmacist, both of whom were in an enclosed area "with no real ability to escape." On this record, the court could reasonably conclude

16

the robbery was not "substantially less serious than the circumstances typically present in other cases." (Rule 4.413(c)(1)(A).)

Even if the court deemed Perlman's drug addiction to be an unusual circumstance under rule 4.413(c)(2)(A) or (B), this did not compel a finding that a grant of probation would serve the interests of justice. (*Stuart*, *supra*, 156 Cal.App.4th at p. 178; *People v. Serrato* (1988) 201 Cal.App.3d 761, 763 [upholding probation ineligibility finding notwithstanding defendant's claim that "his drug and alcohol addictions" rendered his case "unusual"], disapproved on another point in *K.R. v. Superior Court* (2017) 3 Cal.5th 295.) Nor was the court required to accept Perlman's assertion that he had reduced moral culpability because of his drug addiction, particularly where Perlman had prior opportunities to address his substance abuse issues and had either "failed to take advantage" of those opportunities or was unsuccessful in overcoming the problem. The court "considered the specific circumstances of this case," had a reasonable basis for its decision, and acted within its broad discretion in finding Perlman was not eligible for probation. (*Stuart*, at pp. 187, 181.)

## C.

### *No Abuse of Discretion in Imposing the Aggravated Term*

Perlman also challenges the trial court's decision to sentence him to the aggravated term on the robbery conviction. We review that decision for abuse of discretion, reversing only if it " 'is so irrational or arbitrary that no reasonable person could agree with it.' " (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1102.) There was no abuse of discretion. The court weighed the aggravating and mitigating factors and concluded the aggravated term was the "correct term." (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1263 [only "a single aggravating factor is required to

17

impose the upper term"].) Perlman's disagreement with that decision does not demonstrate an abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) And the record belies Perlman's contention that the court "ignored" various mitigating factors; in any event, the court was free to " 'minimize or even entirely disregard mitigating factors without stating its reasons.' " (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1258; *Sperling*, at p. 1102.)

## D.

### *No Abuse of Discretion in Imposing the Deadly Weapon Enhancement*

Perlman's final claim is the court erred by declining to strike the section 12022 deadly weapon enhancement in the interest of justice. Perlman seems to suggest the enhancement should not apply because he used a "replica" gun. This flawed reasoning ignores the express language of the statute, which on its face applies to a defendant who "personally uses a deadly or dangerous weapon in the commission of a felony." (§ 12022, subd. (b)(1).) Perlman acknowledges he "displayed the weapon in a menacing manner to gain compliance with his demand for drugs." On this record, he has not shown the court's decision to impose the deadly weapon enhancement was an abuse of discretion. (*People v. Pearson* (2019) 38 Cal.App.5th 112, 116–118 [denial of request to strike section 12022.53 enhancement "was squarely within the bounds of the trial court's discretion"].)

## E.

### *Sentence Modification*

The parties agree—as do we—that the trial court erred by failing to impose sentence on the commercial burglary conviction (count 2) before staying "any time" on that conviction pursuant to section 654. "[W]hen

18

a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence." (*People v. Duff* (2010) 50 Cal.4th 787, 796; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469 (*Alford*).) A trial court's failure to impose sentence "results in an unauthorized absence of sentence" (*Alford*, at p. 1472) which we have the inherent authority to correct. (*People v. Smith* (2001) 24 Cal.4th 849, 852; *People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1165.)

At the parties' request—and consistent with *Alford*—we modify the judgment to impose the midterm sentence of two years on count 2 and to stay execution of that sentence pursuant to section 654. (*Alford, supra,* 180 Cal.App.4th at p. 1473; *People v. Relkin* (2016) 6 Cal.App.5th 1188, 1198 [modifying judgment to correct section 654 error]; §§ 460, 18, subd. (a) [sentencing triad].) We agree with the parties that a new sentencing hearing will not change Perlman's actual prison time. Thus, the "futility and expense" of remanding for resentencing "militates against it." (*Alford*, at p. 1473.)

## DISPOSITION

The judgment is modified to impose the two-year midterm sentence on the commercial burglary conviction (count 2) and to stay execution of that sentence pursuant to section 654. The trial court is directed to forward to the Department of Corrections and Rehabilitation an amended abstract of judgment. As modified, the judgment is affirmed.

_____
Chou, J.*

WE CONCUR:


_____
Tucher, P.J.


_____
Fujisaki, J.


A157409


_____

     * Judge of the Superior Court of San Mateo County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.