Filed 3/8/24  P. v. Green CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL ERIC GREEN,<br><br>    Defendant and Appellant. | C097287<br><br>(Super. Ct. No. S21CRF0006) |

Decades ago, on July 7, 1985, the victim Jane Hylton was killed in the El Dorado Hills house where she was staying, having sustained 29 knife wounds including wounds to her jugular vein, lungs, and five wounds in her back, a battered face, and a bite wound to her shoulder.  After her case went cold for many years, after a factually innocent man spent 15 years in prison for the murder, and after action taken by the Northern California Innocence Project led to new DNA testing, defendant Michael Eric Green's DNA profile was matched to DNA found on Hylton's nightgown near where she had been bitten and to DNA found in her fingernail scrapings.  In 2022, defendant pleaded no contest to

1

second degree murder, the trial court denied defendant's application for probation, and the court sentenced defendant to an indeterminate term of 15 years to life in prison. On appeal, defendant's sole contention is that the court abused its discretion in denying his application for probation. We affirm.

BACKGROUND

*The Killing of Jane Hylton and the Investigation*

At approximately 3:30 a.m. on July 7, 1985, El Dorado County Sheriff's Office deputies responded to a report of a homicide at a home in El Dorado Hills. In a bedroom, deputies found Hylton in her nightgown lying on a bed. "The coroner's report indicated the victim had a battered face, a bite mark on her left rear shoulder, and 29 stab wounds. The stab wounds included four to the head, one to the jugular vein, one to the chest that perforated a rib and injured a lung, seven on her hands and forearms, and five on her back (one of which pierced her lung)." (*M.G. v. Superior Court* (Nov. 29, 2021, C093615) [nonpub. opn.].) A large piece of flesh was discovered on the floor, which was determined to be tissue from Hylton's chin and jaw. Hylton bled to death as a result of the knife wounds to her jugular vein and lung.

The investigation into Hylton's murder went cold for years. In 1999, Connie Dahl, offering what would eventually turn out to be a false confession, told investigators that she and Ricky Davis killed Hylton. Davis was the son of the woman with whom Hylton had been staying, and Dahl was his girlfriend. Dahl pleaded guilty to involuntary manslaughter and testified against Davis, who was convicted of murder and sentenced to 15 years to life plus one year in prison. Dahl died in 2014. As a result of action taken by the Northern California Innocence Project, new DNA testing was performed on evidence collected from Hylton and the results excluded Davis. His conviction was overturned in 2019, all charges against him were dropped in 2020, and, being found factually innocent, he was released after spending 15 years in custody.

2

The new DNA testing revealed an unknown male DNA profile found on the shoulder area of Hylton's nightgown near where she had been bitten. DNA from Hylton's fingernail scrapings was consistent with the DNA recovered from the nightgown. DNA surreptitiously recovered from defendant's garbage matched the DNA found on Hylton's nightgown. A buccal swab subsequently taken from defendant was also a match.

In February 2020, investigators John Gaines and Joe Ramsey of the El Dorado County District Attorney's Office contacted defendant. Defendant denied any knowledge of the murder, denied knowing Hylton, and did not remember biting anyone. Defendant acknowledged he carried a knife in 1985, and told Gaines that he and his friends from his youth, K.B.[1] and S.G., all carried knives at that time. Defendant had no explanation why his DNA would be found at the El Dorado Hills house. He denied committing the murder. Gaines asked if defendant could possibly have done it, and defendant responded, "I'd like to say no." Gaines took defendant into custody. Later, while in custody, defendant said he "[f]ucked up" in the past.

The next day the investigators met with S.G. They told S.G. they were investigating the 1985 murder of Hylton, and S.G. said, "Yes, I know all about it." S.G. said that on July 7, 1985, he and defendant were at a keg party at K.B.'s house. They took a mini keg from the party and went to a nearby park where they met up with a 14-year-old girl who was Hylton's daughter, A.A., now A.S.

The group drank and smoked marijuana. Hylton's daughter went off with K.B. Later, K.B. walked Hylton's daughter home and defendant and S.G. began to walk back towards K.B.'s house. At some point, S.G. and defendant became separated, and, when S.G. arrived at K.B.'s house, K.B. was asleep but defendant was not there. S.G. went to

---

[1]     We use initials of testifying witnesses and/or Hylton's family members pursuant to California Rules of Court, rule 8.90(b)(10).

3

sleep. He later awoke to find defendant sleeping in the room, and defendant was covered in blood. Thinking defendant might have been injured, he checked on him, but defendant seemed okay. In the morning, S.G. awoke to find defendant outside rinsing his clothes in a kiddie pool in the backyard. The water in the pool was red. S.G. asked defendant about the blood and defendant told him he had killed a rabbit as a sacrifice to "Cthulhu," a character from H.P. Lovecraft books.

On a subsequent day, S.G. saw an article about a murder in El Dorado Hills, and he confronted defendant about it. Defendant admitted killing Hylton. He appeared excited rather than remorseful. Defendant said he had gone to the house "to talk to the girl," and he was confronted by a woman. Defendant told S.G. he had stabbed Hylton with his buck knife and that the tip of the knife broke off in her skull. He said, "she just would not die." Defendant also told S.G. he kicked Hylton in the face and "kicked her jaw off."

S.G. never reported what he knew out of fear of defendant. By way of illustration, during an argument, defendant once told S.G., "You know what I'm capable of," which S.G. believed was a reference to Hylton's murder. S.G. also told investigators he saved a file on his computer including news about Davis "so that if anything happened to him, somebody would see it and put two and two together . . . ."

*Charging and Plea*

In February 2020, defendant was charged with the murder in juvenile court because he was 17 when he allegedly committed the murder. The trial court granted the prosecution's motion to transfer the case from juvenile court to adult criminal court. A criminal complaint filed on January 8, 2021, which was superseded by an information and two amended informations, charged defendant with a single count of murder. (Pen.

4

Code, § 187, subd. (a); count 1.)[2] Defendant pleaded no contest to murder in the second degree.

*Defendant's Criminal History*

Defendant's criminal history included the following convictions and dispositions: 1995 convictions for having a concealed weapon in a motor vehicle (former § 12025, subd. (a)(1)) and possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)), for which he received 40 days in jail and three years' probation; a 2001 conviction for negligently discharging a firearm (§ 246.3), for which he received 90 days in jail and three years' probation; a 2001 conviction for driving under the influence (Veh. Code, § 23152, subd. (a)), for which he received 90 days in jail and three years' probation; and a 2005 conviction for driving under the influence (Veh. Code, § 23152, subd. (a)), for which he received 30 days in jail and four years' probation.

*Application for Probation*

Defendant filed an application for probation. He asserted he did not have any prior felony convictions that would disqualify him from probation, and that, under section 1203, subdivision (e), this was an unusual case in which the interests of justice would be served by granting probation. He relied on a 2020 psychological evaluation by forensic psychiatrist Dr. Matthew Soulier, and a 2022 psychological evaluation by psychologist John Hupka, Ph.D.

Dr. Soulier's Evaluation

According to the account defendant relayed to Dr. Soulier, defendant, K.B., and S.G. drank at a party and took more alcohol to a park where they met Hylton's daughter, A.S., whom they did not previously know. Defendant left the park briefly, and, when he returned, he could not find his friends. He drank more—he had at least 10 drinks that

---

[2] Further undesignated statutory references are to the Penal Code.

night and smoked marijuana—and "stagger[ed]" around, eventually, somehow, finding himself at A.S.'s house. He knocked on the door and someone told him to come in. He stepped into a room where he saw a woman. She grabbed him, and she then fell. She grabbed defendant's legs and defendant then fell down. The woman got up and hit him in the head with a lamp, and his knife, which he always carried, fell to the floor. Defendant grabbed the knife and stabbed the woman. The woman fell and he left. He made his way back to K.B.'s house, found K.B. and S.G. asleep, and he fell asleep on the floor. Days or weeks later, S.G. confronted defendant and said, "You did it," and defendant denied it. However, he conceded he had been worried he would be arrested. But he returned to Roseville and "went on with life." He stated he initially did not realize Hylton was dead, but S.G. offered some details from the newspaper, and "then it was heavy." He continued: "I felt horrible about doing the crime. That was someone's daughter, mother, and aunt. There was another failure. I killed another human. As a man, I hurt a woman." When Dr. Soulier asked defendant how often he thought about the crime, defendant responded, "I don't remember the last time I gave it meaningful thought (before the arrest). Not something that haunted me. I stuffed it all away."

Dr. Soulier emphasized defendant did not have a history of violence, and this murder was completely out of character. Additionally, Dr. Soulier observed that, at the time of the murder, as an adolescent, defendant's frontal brain was immature, and he was more prone to act in an impulsive, short-sighted, and risky manner. Dr. Soulier opined defendant had "excellent rehabilitative potential." Other than the murder, defendant had no history of violence and did not demonstrate antisocial orientation. Dr. Soulier opined defendant's risk of future violence was very low. Past behavior, according to Dr. Soulier, is the best predictor of future behavior, and the murder was defendant's only known violent act.

<u>Dr. Hupka's Evaluation</u>

Dr. Hupka stated that, in his interview with defendant, defendant told him of the 1985 offense that he had just turned 17 and he "got into a fight with this lady and ended up stabbing her." He said he had knocked on the door of a house looking for a girl he had met that night. Someone said, "come in," he went upstairs, and he found the lady standing in a bedroom. The woman grabbed him, would not let go, and hit him with a lamp. He picked up a knife and stabbed her, although he did not remember stabbing her multiple times. He also acknowledged kicking the woman in the jaw because he was "trying to get her off my legs." After she stopped attacking him, he left. When Dr. Hupka asked why defendant had a knife, defendant responded that he and his friends always carried knives. Defendant stated he had not known the "lady died."

Defendant registered as a "low" to "low moderate" risk for future violence on the HCR 20 risk assessment instrument. On the Violence Risk Appraisal Guide-Revised, defendant placed at the 44th percentile for risk of future violent offenses when compared with other male forensic patients, and thus Dr. Hupka characterized him as "in the below average range for risk of future violent offenses."

Dr. Hupka characterized the murder as "an anomaly" in defendant's life, as defendant had no other history of violence. Dr. Hupka noted that, in the 35 years since the murder, defendant had been living in the community and demonstrated no propensity for violence. However, he also stated defendant "has given little thought to the offense, and afterward just continued on with his aimless life. I see no indication of emotional maturity or wisdom with age."

Of defendant's likelihood to reoffend, Dr. Hupka stated: "[T]he psychologist's opinions are only opinions, and the best way to know if someone is likely to reoffend is simply to release them into the community and see what happens. Obviously no Court would rely on such a simple but definitive experiment. Except in this case. In this case, the experiment has been done. In this case [defendant] has been in the community from

7

1985 to 2020. During that 35 year period of time he has absolutely no history of any violent behavior towards others. To the contrary, he is described in his record as a gentle and sweet man. . . . This is an interesting case in which there is no need to speculate on [defendant's] risk of future violence after the incident. We have the advantage of simply looking retrospectively into his past and seeing that in reality he was at no risk to reoffend with violent behavior toward others after the instant offense. Violence towards others is not part of his life course outside of the instant offense." Dr. Hupka noted that, at 54 years old, defendant had aged out of the high-risk age for violent behavior and criminal activity. According to Dr. Hupka, advancing age and time spent in the community without reoffense are two of the most powerful factors in assessing risk. He concluded the "combination of his current age, his demonstrated ability to maintain himself in the community for 35 years completely free of any violent behavior, and the risk assessment tools used in this evaluation, all lead to the conclusion that this man is at low risk to reoffend." Dr. Hupka concluded that, from "a psychological and risk management perspective, incarceration as a deterrent to future offenses is not required."

*Sentencing*

Witnesses for Defendant

At sentencing, defendant presented the testimony of Dr. Elizabeth Cauffman, who testified as an expert in developmental psychology with a focus on adolescence. She testified that cognitive growth and emotional growth develop at different rates. An individual will reach adult-like levels of cognitive development at 16, but emotional development continues into early adulthood. Thus, there is a gap between cognitive development, which is what someone knows, and emotional development, which is what someone can control. She testified the prefrontal cortex, which allows individuals to pause, self-regulate, and "look at nuance in situations," is not fully developed until 25 years of age.

8

Dr. Cauffman testified that an adult may perceive an individual's facial expression as demonstrating fear, shock, or surprise, where an adolescent may perceive the same expression as demonstrating anger. Thus, adolescents can misread cues and misinterpret emotional responses.

Dr. Cauffman also testified that if an individual uses substances, the individual is more likely to be impulsive. Substance use will enhance impulsivity, decrease inhibition, "decrease the brakes, that stopping system," and cause the individual to exercise poor judgment.

Dr. Cauffman testified about a study that followed approximately 1,000 felony-level offenders from when they were 14 to 17 years old until they were 25. The study revealed that approximately 9 percent of the offenders persisted committing felony-level crimes into adulthood while 39 percent desisted. Dr. Cauffman testified that the reason those individuals desisted was the development of impulse control and the ability to think long term.

Defendant also presented several witnesses to testify to his character.

M.D. testified she dated defendant when she was a teenager. She described him as very popular, personable, "the life of the party," and well liked. She was never afraid of him, and he never physically touched her in a harmful way. He could become angry, agitated, and a little aggressive when he drank. However, she never saw him act out in a physical manner. She acknowledged telling an investigator that defendant was short-tempered when he drank, that he drank a lot, and that, when they dated, he had a tendency to be violent. However, she did not mean to imply he was ever violent with her.

Sandra S. testified she and defendant attended middle school and part of high school together. She described defendant as funny, personable, very well liked, and friendly with everybody. As far as she knew, he did not have a reputation for violence. She never saw him angry. Sandra testified she continued to be friends with defendant into adulthood and that defendant had a relationship with her young daughter. She was

9

shocked defendant admitted to this homicide; she had never seen defendant engage in any violence or aggression and what he admitted to seemed very much out of character.

Sara S. knew defendant in high school. He had a reputation as being jovial and fun. Later, they both attended American River College, Sara would give defendant rides to and from school, and they would also spend weekend nights together at a mutual friend's house. They remained friends through their adult lives. She never observed defendant act violently when he was drinking; she never saw any signs of anger or violence.

T.M. knew defendant since the seventh grade. He described defendant as very popular and a funny guy everyone liked to spend time with. He testified that, in high school, he never saw defendant become violent when defendant was drinking. T.M. was surprised to learn defendant admitted to this homicide because it seemed out of character.

K.G. was defendant's former wife. She described defendant as having a good sense of humor and a lovely nature. She testified there was "just not a bad bone in" defendant. She had never been afraid of him. She had never seen him become violent when drinking or otherwise.

Victim Impact Statements

Hylton's daughter A.S. emphasized that, at the time Dahl implicated Davis, detectives influenced her family to believe she was responsible for or involved in Hylton's murder. As a result, one of her family members assaulted her, and she was placed in foster care at 13. In connection with the Davis trial, she was obligated to meet with a doctor to confirm she was not repressing memories, that doctor testified at the trial to discredit her, and the prosecution treated her as a hostile witness. She also emphasized that she had given defendant's name to investigators, but that, at the trial, to further discredit her, they put the wrong Michael Green on the stand to testify he did not know her. She emphasized she had been subjected to aggressive police interrogations numerous times over the years. A.S. also addressed the fact that she lives with the guilt

of "knowing that if [she] never met [defendant], [her] mother might still be with us today." She experienced survivor's guilt.

S.S., also Hylton's daughter, addressed the chronology of events over the preceding 37 years, including the fact that A.S. distanced herself from her family as a result of the false accusation that she was present during the murder. She emphasized defendant allowed Davis to spend 15 years in prison for the murder. She stated that the "sorrow I feel for [Davis] and his family only multiplies the path of the pain, heartache, and destruction [defendant] has caused."

H.M., another of Hylton's daughters, also emphasized the rift in the family created by the false accusation of A.S., as well as the 15-year imprisonment of Davis. H.M. stated she and her family were forced to move. She felt that this ordeal seemed endless.

A.B., another of Hylton's daughters, discussed having her family "torn apart because of this horrible event." She discussed the disbelief, sorrow, blame, shame, and denial her family experienced.

I.P., Hylton's son, also addressed the unwarranted blame focused on A.S. and the harm it did to the family.

Imposition of Sentence

Defense counsel addressed factors she believed militated in favor of granting probation. When defense counsel stated that, if the trial court was considering not imposing a prison term, she would seek a continuance for the crafting of an appropriate probation plan, the court stated it would not be placing defendant on probation. With that, defense counsel submitted.

Prior to imposing sentence, the trial court remarked that, in 26 years of experience on the bench, "this stands out as the single most brutal murder that I can imagine just based on the sheer number and quantity and type of wounds that Ms. Hylton sustained before she died." The court emphasized defendant's remark that "she just didn't want to die," indicating defendant "knew exactly what he did." The court also emphasized the

11

crime's impact on the family, particularly A.S., who "was treated like a criminal, had her entire life uprooted independent of the loss of her mother."

The court first determined that this was not an "unusual case" within the meaning of California Rules of Court, rule 4.413[3] such that probation would serve the interests of justice. Although the court made this determination, it nevertheless went on to conclude that, under rule 4.414, the factors against probation outweighed the factors in favor of probation. The trial court denied probation and sentenced defendant to 15 years to life in prison.

## DISCUSSION

Defendant asserts the trial court abused its discretion in denying his application for probation. He asserts the court abused its discretion in finding this was not an unusual case in which the interests of justice would be served by granting probation (see § 1203, subd. (e); rule 4.413), contending that the overwhelming evidence establishes this case was sufficiently unusual to overcome the presumption of ineligibility for probation. Defendant emphasizes he was a youth with a prefrontal cortex that was not fully developed when he committed the crime, and he has no significant record of prior or subsequent criminal offenses. He further contends his minimal risk of committing future offenses overwhelmingly supports overcoming the presumption of ineligibility. We conclude the trial court did not abuse its discretion in determining this was not an unusual case in which the interests of justice would best be served by granting probation.

"A denial of a grant of probation generally rests within the broad discretion of the trial court and should not and will not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary or capricious manner." (*People v. Edwards* (1976) 18 Cal.3d 796, 807.) The same abuse of discretion standard applies to

---

**3** Undesignated rule references are to the California Rules of Court.

the review of the trial court's determination of whether a case is an unusual one permitting probation. (*People v. Superior Court* (*Du*) (1992) 5 Cal.App.4th 822, 831.)

"The trial judge's discretion in determining whether to grant probation is broad. [Citation.] '[A] " 'decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." ' " ' [Citation.] '[T]hese precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] Generally, ' " '[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' " ' " (*People v. Stuart* (2007) 156 Cal.App.4th 165, 178-179 (*Stuart*).)

"Except in unusual cases in which the interests of justice would best be served if the person is granted probation, probation shall not be granted to," among others, "[a]ny person who used, or attempted to use, a deadly weapon upon a human being in connection with the perpetration of the crime of which that person has been convicted." (§ 1203, subd. (e)(2).) Defendant acknowledges he is such a person, as he used a knife in murdering Hylton.[4]

In determining whether a statutory limitation on probation has been overcome, the court is required to use the criteria set forth in rule 4.413. (See *People v. Superior Court* (*Du*), *supra*, 5 Cal.App.4th at p. 830.) Rule 4.413(c) states: "The following factors may

---

[4]     In light of our analysis and conclusion, we need not address the People's contention that defendant was also presumptively ineligible for probation because he "willfully inflicted great bodily injury" in the perpetration of the crime of which he was convicted. (§ 1203, subd. (e)(3).)

13

indicate the existence of an unusual case in which probation may be granted if otherwise appropriate:  [¶]  Factors relating to basis for limitation on probation:  [¶]  (1) A factor or circumstance indicating that the basis for the statutory limitation on probation, although technically present, is not fully applicable to the case, including:  [¶]  (A) The factor or circumstance giving rise to the limitation on probation is, in this case, substantially less serious than the circumstances typically present in other cases involving the same probation limitation, and the defendant has no recent record of committing similar crimes or crimes of violence; and  [¶]  (B) The current offense is less serious than a prior felony conviction that is the cause of the limitation on probation, and the defendant has been free from incarceration and serious violation of the law for a substantial time before the current offense.  [¶]  (2) Factors limiting defendant's culpability  [¶]  A factor or circumstance not amounting to a defense, but reducing the defendant's culpability for the offense, including:  [¶]  (A) The defendant participated in the crime under circumstances of great provocation, coercion, or duress not amounting to a defense, and the defendant has no recent record of committing crimes of violence;  [¶]  (B) The crime was committed because of a mental condition not amounting to a defense, and there is a high likelihood that the defendant would respond favorably to mental health care and treatment that would be required as a condition of probation; and  [¶]  (C) The defendant is youthful or aged, and has no significant record of prior criminal offenses.  [¶] (3) Results of risk/needs assessment  [¶]  Along with all other relevant information in the case, the court may consider the results of a risk/needs assessment of the defendant, if one was performed.  The weight of a risk/needs assessment is for the court to consider in its sentencing discretion."

"Under rule 4.413, the existence of any of the listed facts does not necessarily establish an unusual case; rather, those facts merely 'may indicate the existence of an unusual case.' " (*Stuart, supra*, 156 Cal.App.4th at p. 178, italics omitted.)  " '[M]ere suitability for probation does not overcome the presumptive bar . . . .  [I]f the statutory

14

limitations on probation are to have any substantial scope and effect, "unusual cases" and "interests of justice" must be narrowly construed,' and rule 4.413 'limited to those matters in which the crime is either atypical or the offender's moral blameworthiness is reduced.' " (*Ibid.*)

In considering rule 4.413(c)(1)(A) and whether the instant offense was "substantially less serious than the circumstances typically present in other cases involving the same probation limitation," the probation limitation at issue is defendant's use of a deadly weapon, a knife, "upon a human being in connection with" his murder of Hylton. (§ 1203, subd. (e)(2).) The record established that Hylton sustained 29 knife wounds resulting in her death. These included four knife wounds to the head, one to the jugular vein, one to the chest that perforated a rib and injured a lung, seven on Hylton's hands and forearms, and five knife wounds on her back, one of which pierced her lung. According to S.G., defendant told him he had stabbed Hylton and that the tip of defendant's knife broke off in Hylton's skull. Additionally, Hylton had a battered face, and she sustained a bite mark on her left shoulder. Defendant told S.G. he kicked Hylton in the face and "kicked her jaw off." A large piece of flesh discovered on the floor was determined to be tissue from Hylton's chin and jaw. Defendant also told S.G. that Hylton "just would not die." Defendant questions the veracity and interpretation of statements made by S.G. However, he has not established S.G.'s statements were false or that the trial court misinterpreted them.

The trial court stated that, in 26 years on the bench, "this stands out as the single most brutal murder that I can imagine just based on the sheer number and quantity and type of wounds that Ms. Hylton sustained before she died." The court also stated, "whatever happened in that home and whatever happened to give rise to the struggle, it is abundantly clear that this woman fought, fought, fought for her life. It wasn't just a simple shot in the back that many of the murder victims that I've dealt with have had to sustain." The court characterized it as a "horrific crime." The trial court's remarks make

15

clear it did not find this case to be "substantially less serious than the circumstances typically present in other cases involving the same probation limitation . . . ." (Rule 4.413(c)(1)(A).)

Defendant principally relies on two factors, those in rule 4.413(c)(2)(C) and (c)(3). Rule 4.413(c)(2)(C) addresses where the "defendant is youthful or aged, and has no significant record of prior criminal offenses." In short, this factor does apply here. Defendant was 17 years old at the time of the murder, and it does not appear he had any significant record of prior offenses. Dr. Cauffman testified at length about the fact that, while cognitive development may reach adult levels at the age of 16, emotional development continues into adulthood and that the prefrontal cortex, which allows individuals to self-regulate, is not fully developed until the age of 25. She testified adolescents can misread cues and misinterpret emotional responses. She also testified substance use will increase impulsivity and cause the individual to exercise poor judgment. Dr. Soulier stated in his evaluation that, at the time of the crime, as an adolescent, defendant's frontal brain was immature, and he was more prone to act in an impulsive, short-sighted, and risky manner.

Rule 4.413(c)(3) provides that, "[a]long with all other relevant information in the case, the court may consider the results of a risk/needs assessment of the defendant, if one was performed. The weight of a risk/needs assessment is for the court to consider in its sentencing discretion."

Dr. Soulier in his evaluation stated defendant had "excellent rehabilitative potential." Other than the murder, defendant had no history of violence. Dr. Soulier believed defendant's risk of future violence was very low. Past behavior, according to Dr. Soulier, is the best predictor of future behavior, and the murder was defendant's only known violent act.

Dr. Hupka characterized defendant as a "low" to "low moderate" risk for future violence based on the HCR 20 risk assessment instrument. He further stated defendant

16

placed in the 44th percentile for risk of future violent offenses on the Violence Risk Appraisal Guide-Revised, which, technically, supports his statement that defendant was "in the below average range for risk of future violent offenses . . . ." Of defendant's likelihood to reoffend, Dr. Hupka stated: "[T]he best way to know if someone is likely to reoffend is simply to release them into the community and see what happens. . . . In this case, the experiment has been done. In this case [defendant] has been in the community from 1985 to 2020. During that 35 year period of time he has absolutely no history of any violent behavior towards others. . . . This is an interesting case in which there is no need to speculate on [defendant's] risk of future violence after the incident. We have the advantage of simply looking retrospectively into his past and seeing that in reality he was at no risk to reoffend with violent behavior toward others after the instant offense. Violence towards others is not part of his life course outside of the instant offense." Dr. Hupka also noted that, at 54 years old, defendant had aged out of the high-risk age for violent behavior and criminal activity. According to Dr. Hupka, advancing age and time in the community without reoffense are two of the most powerful factors in assessing risk. He concluded the "combination of his current age, his demonstrated ability to maintain himself in the community for 35 years completely free of any violent behavior, and the risk assessment tools used in this evaluation, all lead to the conclusion that this man is at low risk to reoffend."

Even accepting as established these two factors on which defendant relies, we cannot conclude the trial court abused its discretion in determining this was not an unusual case in which the interests of justice would best be served if defendant were granted probation (§ 1203, subd. (e)(2)), particularly in light of the brutal nature of the crime and defendant's decades-long evasion of responsibility. Even assuming the existence of the factors on which defendant relies, their presence does not necessarily establish an unusual case, but instead only indicates the case *may* be an unusual one. (*Stuart, supra*, 156 Cal.App.4th at p. 178.)

Defendant contends the trial court "entirely ignored" the factors on which he relies. We do not agree. The record establishes the trial court expressly considered the evidence and argument. However, " '[t]he trial court may but is not required to find the case unusual if the relevant criterion is met under each of the subdivisions.' " (*Stuart, supra*, 156 Cal.App.4th at p. 178.)

Defendant also notes the court mentioned the fact that Davis was convicted of the murder and asserts "that is not something [defendant] had anything to do with." However, even if we accept the premise that defendant was unaware of Davis's plight, his position elides the fact that, (1) defendant committed the murder for which Davis was convicted, and (2) had defendant acknowledged killing Hylton, the circumstances that allowed for the wrongful incrimination of Davis would not have existed. Moreover, while defendant represented at least once that he had been unaware of Hylton's death, there is contradictory evidence in the record indicating he knew Hylton died from her knife wounds.

As stated, " ' "unusual cases" and "interests of justice" must be narrowly construed,' and rule 4.413 [is] 'limited to those matters in which the crime is either atypical or the offender's moral blameworthiness is reduced.' " (*Stuart, supra*, 156 Cal.App.4th at p. 178.) The murder here was indeed atypical, but in the sense that, in the trial court's estimation, it was "the single most brutal murder that I can imagine just based on the sheer number and quantity and type of wounds that Ms. Hylton sustained before she died," which obviously does not militate in favor of probation. While defendant would argue his moral blameworthiness was reduced based on his age and the fact that, as an adolescent, he was emotionally underdeveloped relative to an adult, and he would further argue his record in the community proves he is a low risk to reoffend, we cannot conclude defendant satisfied his burden of establishing the trial court abused its discretion in determining this was not an unusual case in which granting probation would have best served the interests of justice. In other words, we cannot conclude the

18

trial court's decision to deny probation was " 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Id.* at p. 179.)

In light of our determination, we need not address defendant's additional contention that, based on a balancing of the factors in rule 4.414, the trial court should have granted him probation. (See rule 4.413(b) [if court determines statutory limitation on probation is overcome, it "should then apply the criteria in rule 4.414 to decide whether to grant probation"]; *People v. Superior Court* (*Du), supra*, 5 Cal.App.4th at p. 830 ["If the court finds the case to be an unusual one, it must then decide whether to grant probation, utilizing the statutory criteria set forth in" rule 4.414]; accord, *Stuart, supra*, 156 Cal.App.4th at p. 178.)

DISPOSITION

The judgment is affirmed.


                                        /s/
                                        EARL, P. J.



We concur:


    /s/
RENNER, J.


    /s/
FEINBERG, J.


19